AUDET & PARTNERS, LLP
WILLIAM M. AUDET (SBN 117456)
LING Y. KUANG (SBN 296873)
KURT D. KESSLER (SBN 327334)
711 Van Ness Ave., Suite 500
San Francisco, CA 94102-3275
Tel: 415/568-2555
415/568-2556 (fax)
waudet@audetlaw.com
lkuang@audetlaw.com
kkessler@audetlaw.com

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (SBN 149343)
PAULA R. BROWN (SBN 254142)
JENNIFER L. MACPHERSON (SBN 202021)
501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
pbrown@bholaw.com
jmacpherson@bholaw.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| OSCAR MUNOZ, individually. and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| T-MOBILE US, INC., a Delaware corporation & T-MOBILE USA, INC. | **DEMAND FOR JURY TRIAL** |
| Defendants. | Complaint Filed:<br>Trial Date: |

Case No.

Plaintiff Oscar Munoz, individually and on behalf of the general public and all others similarly situated, brings this class action against Defendants T-Mobile US, Inc. & T-Mobile USA, Inc. ("T-Mobile" and/or "Defendants") and alleges the following:

## NATURE OF THE CASE

1.    This action arises out of T-Mobile's failure to adequately protect Plaintiff's and other T-Mobile customers' highly sensitive personal identifying information ("PII"). T-Mobile is a telecommunications and technology company that provides wireless network and data services, home internet, financial services (via T-Mobile Money) and sells mobile telephones and accessories. It is the second largest wireless carrier in the United States with more than 110 million customers. As part of its business, T-Mobile collects, stores, and uses a vast amount of its customers' PII.

2.    T-Mobile is aware of how valuable its customers' PII is to cybercriminals. As a mobile carrier with a large trove of sensitive data about millions of American consumers, T-Mobile should have known, according to the Federal Communications Commission ("FCC"), that it "ha[s] a unique responsibility to protect [this] customer information" especially so given that "[t]his incident is the latest in a string of data breaches at the company."[1]

3.    T-Mobile has known about its own vulnerability to intrusion as a mobile carrier for many years. Over the past five years, T-Mobile has suffered data breaches on at least five known occasions where significant data and customers' PII were not adequately protected. Despite these repeated incidents, T-Mobile continues to both inadequately protect its customers' PII and downplay the significant harm imposed on its customers based on these data breaches.

---

[1]    Eva Mathews, et al., T-*Mobile data breach exposes about 37 million accounts*, YAHOO! FINANCE (via REUTERS), (Jan. 19, 2023), available at: https://www.yahoo.com/lifestyle/t-mobile-says-investigating-data-211942902.html

00198937

Case No.

4.     The data breach at issue in this case began on November 25, 2022 and continued, undetected by T-Mobile, for six weeks until January 5, 2023. The fact that "criminals were in T-Mobile's system for more than a month before being discovered […] suggests T-Mobile's defenses do not utilize modern security monitoring and threat hunting teams, as you might expect to find in a large enterprise like a mobile network operator" according to Chester Wisniewski, field chief technical officer of applied research at the security firm Sophos.[2]

5.     Moreover, this sixth and latest breach at T-Mobile is emblematic of a company "culture" and "pattern" demonstrating a disregard for, if not negligence towards, protecting its customers' sensitive PII.[3] Cybersecurity expert Mauricio Sanchez, research director of network security at Dell'Oro Group, has stated that "[t]o be hacked twice in the span of a bit over a year is pretty egregious" behavior and it is "evident" that T-Mobile has not improved their security culture and environment. *Id*. Zeus Kerravala, founder and principal analyst at ZK Research, a cybersecurity consulting firm, commented that this latest breach is "all you need to know about their lack of urgency around this" issue of cybersecurity. *Id*.

6.     The data breach here involved a cybercriminal accessing and obtaining T-Mobile's customers' PII through an Application Programming Interface ("API") without authorization. According to T-Mobile, the PII obtained by the cybercriminal included customers' names, billing addresses, emails, phone numbers, dates of birth, account numbers, and information about the accounts, such as the number of lines on the account and service plan features. In total, the cybercriminal obtained the PII for approximately 37 million T-Mobile customers including Plaintiff and the other Class members ("Data Breach").

---

[2]     Lily Newman, *T-Mobile's $150 Million Security Plan Isn't Cutting It*, WIRED, (Jan. 20, 2023), available at: https://www.wired.com/story/tmobile-data-breach-again/
[3]     Matt Kapko, *Experts question T-Mobile's security culture as breach cycle churns*, CYBERSECURITY DIVE, (Jan. 20, 2023), available at: https://www.cybersecuritydive.com/news/t-mobile-security-breach-pattern/640909/

Case No.
CLASS ACTION COMPLAINT

7.      T-Mobile, as part of its egregious pattern and behavior of not adequately informing its customers about the harm they legitimately face as a result of a data breach, downplayed the significance of the Data Breach in its public statements and notices to the Data Breach victims, telling those with their PII breached that "no information was obtained for impacted customers that would compromise the safety of customer accounts or finances."[4] However, the circumstances of the Data Breach and the type of PII stolen directly harms the Data Breach victims by placing them at significant risk for further identify theft related crimes and making them vulnerable targets of phishing attempts and other efforts using the stolen PII to obtain additional information to commit identity theft and fraud.

8.      Confirming the harm faced by affected customers, technology news outlets have highlighted that "[t]he information involved in the new breach could be especially useful to attackers for SIM swap attacks, in which they take control of victims' phone numbers and then abuse the access to take over accounts, including by capturing two-factor authentication codes sent over SMS."[5] Chester Wisniewski, field chief technical officer of applied research at the security firm Sophos has also confirmed that "[t]he information stolen in this breach" is not only useful but "ideal for SIM swapping attacks and other forms of identity theft." *Id*. Additionally, T-Mobile has a history of permitting unauthorized SIM card swaps with limited customer information, putting the Data Breach victims at even more elevated risk for such attacks.

9.      Defendants owed a duty to Plaintiff and Class members to maintain reasonable and adequate security measures to secure, protect, and safeguard customer PII it collected and stored. Defendants breached that duty by, *inter alia*, failing to

---

[4]     *T-Mobile Informing Impacted Customers about Unauthorized Activity*, T-MOBILE, (Jan. 19, 2023), available at: https://www.t-mobile.com/news/business/customer-information (hereafter "Breach Notice").

[5]     *See*, Newman, *supra* note 2.

implement and maintain reasonable security procedures and practices to protect the PII from unauthorized access and theft, and unnecessarily storing and retaining Plaintiff and Class members' personal information on its inadequately protected systems.

10.     The Data Breach happened because of Defendants' inadequate cybersecurity, which caused Plaintiff and Class members' PII to be accessed and obtained. This action seeks to remedy these failings. Plaintiff brings this action on behalf of himself and all affected T-Mobile customers.

## VENUE AND JURISDICTION

11.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332, because this is a proposed class action in which there are more than 100 class members, the combined claims of class members exceed $5,000,000, and Plaintiff and Defendants are citizens of different states.

12.     This Court has personal jurisdiction over Defendants because Defendants is authorized to and regularly conducts business in the State of California. T-Mobile markets, sells, and advertises its products and services to Plaintiff and Class members located in the State of California and, therefore, has sufficient minimum contacts to render the exercise of jurisdiction by this Court proper and necessary.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants transacts business and may be found in this District.

## PARTIES

14.     Plaintiff Oscar Munoz is a resident of Los Angeles, California and a current customer of T-Mobile. As a T-Mobile customer, Plaintiff entrusted his sensitive PII to T-Mobile with the understanding that his PII would be kept secure through T-Mobile's implementation of reasonable and adequate security measures. Plaintiff received notice from T-Mobile that his PII may have been accessed in connection with the Data Breach.

15.    Defendant T-Mobile US, Inc. is a corporation organized under the laws of the state of Delaware, with its principal place of business and headquarters in Bellevue, Washington and Overland Park, Kansas. T-Mobile markets and sells wireless telephone services and sells mobile telephones throughout the United States, including throughout California.

16.    Defendant T-Mobile USA, Inc. is a wholly owned subsidiary of T-Mobile US, Inc.

## FACTUAL ALLEGATIONS

### *T-Mobile Collects and Stores its Customers' PII and Promises to Safeguard the Information*

17.    T-Mobile markets, sells and provides wireless telephone services to customers nationwide. T-Mobile also sells wireless telephones for use with its services. In connection with selling and providing its services, T-Mobile collects extensive PII from its customers. Plaintiff and Class Members are current and former customers of T-Mobile who provided T-Mobile with their PII.

18.    Plaintiff and Class Members entrusted T-Mobile with their sensitive and confidential information, including their PII. Plaintiff and Class Members relied on T-Mobile to keep their PII confidential and securely maintained.

19.    T-Mobile has a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties.

20.    T-Mobile promises customers that it is firmly committed to their privacy and has implemented reasonable policies and practices that protect their PII.

21.    T-Mobile's Privacy Policy in place at the time of the Data Breach details its promises regarding the treatment of its customers' PII.[6] The Privacy Policy applies to its customers' "name, address, or email address, as well as less obvious data like demographic data, device and usage data, call records, advertising ID, and location

---

[6]    The Privacy Policy in place when the Data Breach began on November 25, 2022, is dated September 28, 2022.

6                                Case No.

data." T-Mobile explains in its Privacy Policy that it collects this type of personal data directly from its customers when its customers provide it to open an account, automatically when its customers use T-Mobile services, from other sources, such as financial institutions and credit agencies, and "[b]y using or combining data to infer insights about [its customers]…"

22.    T-Mobile explains how it uses its customers' PII for T-Mobile's own business purposes and profit. For example, T-Mobile confirms that it uses customers' personal data to "[a]dvertise and market products and services from T-Mobile and other companies to you, including through targeted advertising and communications about promotions and events, contents, and sweepstakes" and to "create business and market analysis and reports." T-Mobile further explains that it shares its customers' "personal data with its affiliates for things like providing you products and services, and for marketing and advertising…."

23.    T-Mobile acknowledges the value of its customers' PII and, therefore, promises that it "use[s] administrative, technical, contractual, and physical safeguards designed to protect your data" and its customers' PII will be disclosed only "with your consent, which we may get in writing, online or orally." As described below, T-Mobile failed to comply with the promises made in its Privacy Policy.

24.    T-Mobile also maintains, and did maintain throughout the Data Breach, a Privacy Center on its website which states: "We respect your privacy and appreciate your trust. We're here to make it easy to understand what information we collect, how we use and protect it, and the choices you can make."

25.    Under "[u]nderstand our privacy practices," T-Mobile promises, "[w]e want to let you know what personal data we collect and use and how we protect and share your data. Our privacy notices give you a clear picture of our privacy practices." T-Mobile then refers customers to its Privacy Policy.

00198937
Case No.

*The Data Breach*

26.   On January 19, 2023, T-Mobile notified the SEC of the Data Breach through a "current report" filing. T-Mobile explained that on January 5, 2023, it "identified that a bad actor was obtaining data through a single Application Programming Interface ("API") without authorization." T-Mobile explained that "the impacted API" contained "customer account data, including name, billing address, email, phone number, date of birth, T-Mobile account number and information such as the number of lines on the account and plan features."[7] While T-Mobile attempted to downplay the importance of the type of customer information stolen, it admitted that "the bad actor(s) obtained data from this API for approximately 37 million current postpaid and prepaid customer accounts."

27.   T-Mobile also admitted that the cybercriminal(s) that executed the Data Breach "first retrieved data through the impacted API starting in or around November 25, 2022." With T-Mobile not discovering the breach until January 5, 2023, that means the cybercriminal(s) were able to freely access and obtain customers' PII for nearly six weeks without detection.

28.   T-Mobile's public press release about the Data Breach on January 19, 2023, was even less forthcoming about the risks of identity theft and fraud its customers would face as a result. T-Mobile minimized the Data Breach, explaining that the cybercriminal only obtained "limited types of information on their accounts" but that "customer accounts and finances should not be put at risk directly by this event." T-Mobile also stated that "[t]here is also no evidence that the bad actor breached or compromised T-Mobile's network or systems." These statements are misleading because about the type of information taken, the potential ways criminals can use that information to commit identity theft and other fraud, and the risks the Data Breach victims face.

---

[7]   T-Mobile US, Inc. Form 8-K, dated January 19, 2023.

00198937

29.    In its January 19, 2023, SEC filing and press release, T-Mobile stated that it was beginning to notify the Data Breach victims.

30.    However, T-Mobile's notification process was far from straightforward and woefully inadequate. A customer was required to login to their T-Mobile account online or through their mobile application in order to see whether they were impacted by the breach.  Customers, who for example have their accounts set to autopay, may not need to login and would otherwise not see this notice online. While T-Mobile states that notice of breach will be included in monthly statements to customers, it is not clear if paperless customers will receive mailed notice that they had been subject to the Data Breach. More confusing, some T-Mobile customers (those who use Metro or Assurance) will receive notice by SMS and email but no apparent similar notices are provided to the primary T-Mobile customers, nor indication why T-Mobile cannot do so since it must also have these customers' phone and email contact information.

31.    Upon logging into their T-Mobile accounts, a Data Breach victim sees the following limited notice that PII information about them had been obtained without their authorization on the top of their account dashboard:



32.    Notably, T-Mobile continues to downplay the seriousness of the breach by stating that customer accounts and finances are "not put directly at risk by this event" and even brazenly touts its cybersecurity practices by claiming that it was T-Mobile and its "systems and policies" that "prevented the most sensitive times of customer information from being accessed."

9    Case No.

CLASS ACTION COMPLAINT

33.    Clicking the "Learn more" link directs a Data Breach victim to a generic webpage    (https://www.t-mobile.com/brand/customer-information-2023)    that continues the theme of minimizing the real risk and harm imposed on Data Breach victims by stating that the cybercriminal[s] only obtained "limited types of information," and by falsely conveying a sense of security by claiming T-Mobile employs "safeguards" that represent "significant investments [they've] made in enhancing our cybersecurity systems and processes over the past 18 months."

34.    T-Mobile also fails to notify customers about the scope of the Data Breach. It is reported that the breach may have affected Google Fi customers. Google Fi is a Mobile Virtual Network Operator ("MVNO") telecommunications service by Google that provides telephone calls, SMS, and mobile broadband using cellular networks and Wi-Fi. Google Fi uses networks operated by T-Mobile and U.S. Cellular.

35.    Google Fi confirmed a data breach that is likely related to the T-Mobile Data Breach. TechCrunch reports that Google sent an email to customers on Monday (January 30, 2023) notifying them that Google Fi's primary network provider recently informed the company there had been suspicious activity relating to a third-party support system containing a "limited amount" of Google Fi customer data. The timing of the notice — and the fact that Google Fi uses a combination of T-Mobile and U.S. Cellular for network connectivity — suggests the breach is linked to T-Mobile.[8]

36.    Google says the hackers accessed limited customer information, including phone numbers, account status, SIM card serial numbers, and information related to details about customers' mobile service plan, such as whether they have selected unlimited SMS or international roaming. Theft of such information could allow bad actors to engage in SIM swapping, SIM jacking or SIM cloning whereby a victim's phone number could be used to send and receive phone calls and text

---

[8]    *Google Fi says hackers accessed customer's information*, TechCrunch (January 31, 2023), available at: https://techcrunch.com/2023/01/31/google-fi-customer-data-breach/

messages and to gain access to (and reset passwords) a victim's other online accounts that are protected by the hijacked phone number including email accounts and financial accounts (e.g., bank or crypt accounts).

37.    T-Mobile's notice to Data Breach victims fell woefully short of sufficiently notifying Plaintiff and Class members of the details of the breach and the significant risks they face.

### *T-Mobile Knew It and Its Customers' PII Were High Risk Targets*

38.    By November 2022, T-Mobile knew that T-Mobile the customers PII it maintained were high risk targets for identity thieves and other criminals. Indeed, T-Mobile has been subject to several breaches prior to this Data Breach that put T-Mobile on notice of its vulnerabilities. This Data Breach and the resulting harm Plaintiff and Class members have suffered are a direct result of T-Mobile's deficient security practices.

39.    In October 2017, a security researcher discovered a serious security hole in T-Mobile's website that allowed hackers to access customers' email addresses, accounts and phone networks code by simply using the customer's telephone number.[9] The security researcher explained that anyone could have used the security hole to obtain the PII of every T-Mobile customer and put it into a searchable database, resulting in a very significant data breach. Prior to its discovery by the security researcher, "a bunch of SIM swapping kids had [the hack] and used it for quite a while" and had even created a YouTube video with instructions for others.[10]

40.    The customer PII accessible from T-Mobile through the security hole was sufficient for hackers to convince "T-Mobile technicians into handing over replacement SIMs by pretending they're the owners of the line."[11] T-Mobile did not

---

[9]    https://www.engadget.com/2017-10-11-t-mobile-website-flaw-social-engineering-hacks.html (last visited Jan. 30, 2023)

[10]    *Id.*

[11]    *Id.*

discover the security hole on its own and had no mechanisms in place to do so. After it was brought to their attention, T-Mobile acted nonchalant, publicly stating that T-Mobile "resolved the vulnerability that was reported to us by the researcher," and offering the researcher $1,000.[12]

41.    In August 2018, T-Mobile revealed that hackers stole the personal information of two million of its customers, including names, email addresses, passwords, account numbers, and other billing information.[13] Although T-Mobile initially stated that the stolen passwords were encrypted, security researchers quickly determined that the hash algorithm used by T-Mobile to encrypt the passwords was easily reverse engineered to reveal the full password that had been stolen.

42.    In November 2019, T-Mobile notified customers via text message that T-Mobile's cybersecurity team "discovered and shut down malicious, unauthorized access to some information related to your T-Mobile prepaid wireless account."[14] The stolen customer data included names, billing addresses, phone numbers, account numbers, and information about what plans and features the customers chose.[15] While T-Mobile did not reveal how the hackers accessed the data, it reassured customers: "We take the security of your information very seriously and have a number of safeguards in place to protect your personal information from unauthorized access."[16]

43.    In March 2020, T-Mobile suffered yet another data breach where hackers gained unauthorized access T-Mobile employee emails accounts that contained customer account information including names, addresses, phone numbers, account

---

[12]    *Id.*
[13]    https://www.vice.com/en/article/a3qpk5/t-mobile-hack-data-breach-api-customer-data (last visited Jan. 30, 2023)
[14]    https://www.engadget.com/2019-11-22-t-mobile-data-breach.html (last visited Jan. 30, 2023)
[15]    *Id.*
[16]    *Id.*

Case No.

00198937

numbers, rate plans and features, and billing information.[17] T-Mobile reassured its customers that it was working with cybersecurity experts to fix the problem.

44.    In August 2021, T-Mobile announced it had suffered a massive data breach affecting its current, former and prospective customers. The data breached included names, phone numbers, dates of birth, social security numbers, driver's license numbers, and account PINs.[18] T-Mobile originally downplayed the number of customers affected, but ultimately acknowledged that more than 75 million customers' PII was breached. The breach occurred when a single cybercriminal was able to use an unsecured access point to enter T-Mobile's internal network.[19] This attack was successful because T-Mobile failed to implement industry security standards.

45.    T-Mobile continued to suffer from security incidents. In December 2021, T-Mobile notified several customers regarding SIM card attacks, where T-Mobile had reassigned the customer's mobile number to an unauthorized user. The breach that allowed the SIM card swaps included customers' names, phone numbers, accounts numbers, and information about their telephone plans.[20]

46.    In April 2022, cybersecurity expert Brian Krebs discovered that the LAPSUS$ cybercrime group breached T-Mobile several times, stealing its source code.[21] The criminals were able to obtain T-Mobile employee VPN credentials and easily conduct SIM swamps of T-Mobile customers' phones. Krebs determined that "LAPSUS$ members continuously targeted T-Mobile employees, whose access to

---

[17]      https://www.tmonews.com/2020/03/t-mobile-reveals-data-breach-customer-account-info-accessed/ (last visited Jan. 30, 2023)

[18]      https://www.fiercewireless.com/operators/t-mobile-confirms-47-8m-people-hit-by-its-data-breach (last visited Jan. 30, 2023)

[19]      https://www.databreachtoday.com/t-mobile-says-systems-illegally-accessed-as-probe-continues-a-17303 (last visited Jan. 30, 2023)

[20]      https://www.theverge.com/2021/12/28/22857619/t-mobile-cyberattack-data-breach-december-2021-cpni-sim-swap (last visited Jan. 30, 2023)

[21]      https://krebsonsecurity.com/2022/04/leaked-chats-show-lapsus-stole-t-mobile-source-code/ (last visited Jan. 30, 2023)

internal company tools could give them everything they needed to conduct hassle-free 'SIM swaps' – reassigned a target's mobile phone number to a device they controlled."[22] As Krebs explained, "[t]hese unauthorized sim swaps allow an attacker to intercept a target's text messages and phone calls, including any links sent via SMS for password resets, or one-time codes sent for multi-factor authentication."[23]

### *PII Is a Valuable Property Right that T-Mobile Knew Should Be Protected*

47.    Defendants could have prevented this Data Breach by properly securing and encrypting the PII of Plaintiff and Class Members. Defendants' negligence in safeguarding the PII of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to T-Mobile through prior data breaches and warnings to wireless carriers generally to protect and secure sensitive data they possess.

48.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[24] The ramifications of Defendants' failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen, the fraudulent use of that information and subsequent damage to victims may continue for years.

49.    PII is a valuable property right.[25] California has repeatedly recognized this property right. In a Federal Trade Commission ("FCC") roundtable presentation, former Commissioner, Pamela Jones Harbour, underscored this point by observing:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit.[26]

---

[22]    *Id.*

[23]    *Id.*

[24]    17 C.F.R. § 248.201 (2013).

[25]    *See* John T. Soma, et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *2 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[26]    Federal Trade Commission, *Statement of FTC Commissioner Pamela Jones Harbour*

00198937

50.    The value of PII as a commodity is measurable.[27] "PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets."[28] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market" for several years.

51.    Companies recognize PII as an extremely valuable commodity akin to a form of personal property. For example, Symantec Corporation's Norton brand has created a software application that is able to provide the value of a person's identity on the black market.[29]

52.    As a result of the real value of PII and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, Social Security numbers, PII and other sensitive information directly on various Internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims. In one study, researchers found hundreds of websites displaying stolen PII and other sensitive information. Strikingly, none of these websites were blocked by Google's safeguard filtering mechanism – the "Safe Browsing list."

53.    Recognizing the high value that consumers place on their PII, some companies now offer consumers an opportunity to sell their PII to advertisers and other third parties themselves. The idea is to give consumers more power and control over the type of information they share – and who ultimately receives that information. By making the transaction transparent, consumers will make a profit

---

(Remarks Before FTC Exploring Privacy Roundtable) (Dec. 7, 2009), https://www.ftc.gov/public-statements/2009/12/remarks-ftc-exploring-privacy-roundtable.
[27]    *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market* (April 28, 2014), *available at* http://www.medscape.com/viewarticle/824192.
[28]    *See* Soma, *Corporate Privacy Trend, supra.*
[29]    Risk Assessment Tool, Norton 2010, www.everyclickmatters.com/victim/assessment-tool.html.

00198937

Case No.

from the disclosure of their PII.[30] This business has created a market for the sale and purchase of this valuable data directly by the true owners of that data.[31]

54.     Consumers place a high value not only on their PII, but also on the *privacy* of their data. Researchers shed light on how much consumers value their data privacy – and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[32]

55.     One study on website privacy determined that U.S. consumers valued the restriction of improper access to their PII at between $11.33 and $16.58 per website.[33]

56.     Any company that transacts business with a consumer and then compromises the privacy of consumers' PII has therefore deprived that consumer of the full monetary value of the consumer's transaction with the company.

### *Theft of PII Has Grave and Lasting Consequences for Victims*

57.     The theft or breach of PII is serious with identity thieves using PII to take over existing financial accounts, open new financial accounts, receive government benefits and incur charges and credit in a person's name.[34] This type of identity theft is so harmful because it may take time for the victim to become aware of the theft and can adversely impact the victim's credit rating.

---

[30]     Steve Lohr, *You Want My Personal Data? Reward Me for It*, N.Y. Times (July 16, 2010) *available at* https://www.nytimes.com/2010/07/18/business/ 18unboxed.html.
[31]     *See* Julia Angwin and Emil Steel, *Web's Hot New Commodity: Privacy*, Wall Street Journal (Feb. 28, 2011) *available at* https://www.wsj.com/articles/SB10001424052748703529004576 160764037920274.
[32]     Janice Y. Tsai, et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study Information Systems Research* 22(2) 254, 254 (June 2011), *available at* https://www.jstor.org/stable/23015560?seq=1# page_scan_tab_contents.
[33]     II–Horn, Hann, et al., *The Value of Online Information Privacy: An Empirical Investigation* (Mar. 2003) at table 3, *available at* https://ideas.repec.org/ p/wpa/wuwpio/0304001.html (emphasis added).
[34]     *See* GAO, GAO Report 9 (2007) *available at* http:///www.gao.gov/new.items/d07737.pdf.

58.    In addition, victims of identity theft will face "substantial costs and inconveniences repairing damage to their credit records … [and their] good name." According to the FTC, identity theft victims must spend countless hours and large amounts of money repairing the damage to their good name and credit record.[35]

59.    Identity thieves use personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. According to Experian, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utilities; obtain a mobile phone; open a bank account and write bad checks; use a debit card number to withdraw funds; obtain a new driver's license or ID; use the victim's information in the event of arrest or court action.[36]

60.    According to the IBM and Ponemon Institute's 2019 "Cost of a Data Breach" report, the average cost of a data breach per consumer was $150 per record.[37] Other estimates have placed the costs even higher. A 2013 Norton Report estimated that the average cost per victim of identity theft—a common result of data breaches— was $298 dollars.[38]  And in 2019, Javelin Strategy & Research compiled consumer complaints from the FTC and indicated that the median out-of-pocket cost to consumers for damage control on identity theft was $375.[39]

---

[35]    *See* FTC Identity Theft Website: https://www.consumer.ftc.gov/features/feature-0014-identity-theft.

[36]    *See* Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself?*, EXPERIAN (Sept. 7, 2017), *available at* https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[37]    Brook, *What's the Cost of a Data Breach in 2019*, *supra*.

[38]    Norton By Symantec, 2013 Norton Report 8 (2013), *available at* https://yle.fi/tvuutiset/uutiset/upics/liitetiedostot/norton_raportti.pdf.

[39]    Facts + Statistics: *Identity Theft and Cybercrime*, Insurance Information Institute, *available at* https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (citing the Javelin report).

Case No.

00198937

61.    A person whose PII has been compromised may not experience identity theft for years. According to the Government Accountability Office:

> "[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."

62.    For example, in 2012, hackers gained access to LinkedIn users' passwords. However, it was not until May 2016, four years after the breach, that hackers released the stolen email and password combinations.[40]

63.    Additionally, the type of breach that occurred here indicates that the cybercriminals took the PII with the intention of using it to commit identity theft and fraud. The cybercriminals targeted T-Mobile for its customers' PII, accessed an unsecured API, and actually took the PII of 37 million T-Mobile customers. The cybercriminals can now use the PII to target these customers by sending phishing texts to their T-Mobile phones or phishing emails, seeking additional information. With the PII that was taken in the Data Breach, including information about Plaintiff and Class Members' T-Mobile accounts, Plaintiff and Class Members are at particular risk for being manipulated by the cybercriminals into responding to the phishing attacks. Yet, T-Mobile's notice of the Data Breach does not even warn the victims of such risks and advise on how to be vigilant against them.

64.    Additionally, the FTC has specifically warned of attacks targeting mobile phone users. In so-called SIM card attacks a fraudster convinces the victim's cellular service provider to switch the victims cell phone number to a different device.[41] The criminal is then able to receive text messages from the victim's accounts to reset passwords and obtain unauthorized access.

---

[40]    *See* Cory Scott, *Protecting Our Members*, LINKEDIN (May 18, 2016), *available at* https://blog.linkedin.com/2016/05/18/protecting-our-members.
[41]    https://www.fcc.gov/consumers/guides/cell-phone-fraud

65.    SIM card swapping resulting from a breach of its customers' PII is not new to T-Mobile. In December 2021, T-Mobile disclosed that several customers had been subject to SIM card attacks: "We informed a very small number of customers that the SIM card assigned to a mobile number on their account may have been illegally reassigned or limited account information was viewed."

66.    The PII obtained during the Data Breach, which includes information about the victims' T-Mobile accounts, puts Plaintiff and Class Members are risk for SIM card swap fraud.

67.    It is within this context that Plaintiff and millions of T-Mobile customers must now live with the knowledge that their PII is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black-market.

## CLASS DEFINITION AND ALLEGATIONS

68.    Plaintiff brings this nationwide class action on behalf of himself and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

69.    The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> All United States residents whose PII was accessed in the Data Breach (the "Nationwide Class").

70.    In the alternative to claims asserted on behalf of the Nationwide Class, Plaintiff assert claims on behalf of a class, defined as follows:

> All individuals residing in California whose PII was actually or accessed in the Data Breach (the "California Class").

71.    Excluded from the Classes are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not

00198937

Case No.

limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

72. Plaintiff reserves the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

73. <u>Numerosity</u>, Fed R. Civ. P. 23(a)(1): The Nationwide Class (the "Class") are so numerous that joinder of all members is impracticable. Defendants has identified millions of individuals whose PII may have been improperly accessed in the Data Breach, and the Class is apparently identifiable within Defendants' records.

74. <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

      a. Whether Defendants had a duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the PII it collected from Plaintiff and Class members;

      b. Whether Defendants breached its duties to protect the PII of Plaintiff and each Class Member; and

      c. Whether Plaintiff and each Class Member are entitled to damages and equitable relief.

75. <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members because all had their PII compromised as a result of the Data Breach, due to Defendants' misfeasance.

76. <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because Defendants has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly

and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

77.    <u>Adequacy</u>, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that he has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages he has suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

78.    <u>Superiority and Manageability</u>, Fed. R. Civ. P. 23(b)(3): The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

79.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered;

proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

80.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

81.    Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

82.    Unless a Class-wide injunction is issued, Defendants may continue in their failure to properly secure the PI of Class Members, Defendants may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendants may continue to act unlawfully as set forth in this Complaint.

83.    Further, Defendants has acted or refused to act on grounds generally applicable to the Classes and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

## COUNT I

### Violation of the California Unfair Competition Law ("UCL")

### (Cal. Bus. & Prof. Code §§ 17200, *et seq.*)

84.    Plaintiff re-alleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

85.    The UCL prohibits any "unlawful," "fraudulent" or "unfair" business act or practice and any false or misleading advertising, as those terms are defined by the UCL and relevant case law. By virtue of the above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused

00198937

the Data Breach, Defendants engaged in unlawful, unfair and fraudulent practices within the meaning, and in violation of, the UCL.

86.    In the course of conducting its business, Defendants committed "unlawful" business practices by, *inter alia*, knowingly failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and Class members' PII, and by violating the statutory and common law alleged herein, including, *inter alia*, Article I, Section 1 of the California Constitution (California's constitutional right to privacy). Plaintiff and Class Members reserve the right to allege other violations of law by Defendants constituting other unlawful business acts or practices. Defendants' above-described wrongful actions, inaction, omissions, and want of ordinary care are ongoing and continue to this date.

87.    Defendants also violated the UCL's unlawful prong by breaching contractual obligations created by its Privacy Policy and by knowingly and willfully or, in the alternative, negligently and materially violating Cal. Bus. & Prof. Code § 22576, which prohibits a commercial website operator from "knowingly and willfully" or "negligently and materially" failing to comply with the provisions of its posted privacy policy. Plaintiff and Class Members suffered injury in fact and lost money or property as a result of Defendants' violations of its Privacy Policy.

88.    Defendants violated the UCL by failing to adequately and timely notify Plaintiff and Class Members regarding the unauthorized release and disclosure of their PII. If Plaintiff and Class members had been adequately and timely notified in an appropriate fashion, they could have taken precautions to safeguard and protect their PII and identities.

89.    Defendants' above-described wrongful actions, inaction, omissions, want of ordinary care, misrepresentations, practices, and non-disclosures also constitute "unfair" business acts and practices in violation of the UCL in that

Defendants' wrongful conduct is substantially injurious to consumers, offends legislatively-declared public policy, and is immoral, unethical, oppressive, and unscrupulous. Defendants' practices are also contrary to legislatively declared and public policies that seek to protect PII and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected by laws such as Article I, Section 1 of the California Constitution (California's constitutional right to privacy) and the Federal Trade Commission Act ("FTC Act") (15 U.S.C. § 45). The gravity of Defendants' wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendants' legitimate business interests other than engaging in the above-described wrongful conduct.

90.　Plaintiff and Class members suffered injury in fact and lost money or property as a result of Defendants' adequately safeguard their PII in that a portion of the money Plaintiff and Class Members paid for Defendants' products and services to fulfill the contractual obligations set forth in T-Mobile's Privacy Policy including maintaining the security of their PII, and Defendants failed to fulfill those obligations.

91.　The UCL also prohibits any "fraudulent business act or practice." Defendants' above-described claims, nondisclosures and misleading statements were false, misleading and likely to deceive the consuming public in violation of the UCL.

92.　As a direct and proximate result of Defendants' above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach and its violations of the UCL, Plaintiff and Class Members have suffered injury in fact and lost money or property as a result of Defendants' unfair and deceptive conduct by paying more for T-Mobile's products and services than they otherwise would have had they known T-Mobile was not providing the reasonable security for its customers' PII. Had Plaintiff and Class Members known about T-Mobile substandard data security practices they would not have purchased T-Mobile's products or services or would have paid less for them. T-

Mobile's security practices have economic value in that reasonable security practices reduce the risk of theft of customer's PII.

93.     Plaintiff and Class Members have also suffered (and will continue to suffer) loss of money and other injury and actual harm in the form of, *inter alia*, (i) an imminent, immediate and the continuing increased risk of identity theft and identity fraud which require paying for protective and remedial services for which they are entitled to compensation, (ii) invasion of privacy, (iii) breach of the confidentiality of their PII, (iv) deprivation of the value of their PII, for which there is a well-established national and international market, and/or (v) the financial and temporal cost of monitoring their credit, monitoring financial accounts, and mitigating damages.

94.     Unless restrained and enjoined, Defendants will continue to engage in the above-described wrongful conduct and more data breaches will occur. Plaintiff, therefore, on behalf of himself, Class Members, and the general public, also seeks restitution and an injunction prohibiting Defendants from continuing such wrongful conduct, and requiring Defendants to modify its corporate culture and design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures protocols, and software and hardware systems to safeguard and protect the PII entrusted to it, as well as all other relief the Court deems appropriate, consistent with Bus. & Prof. Code § 17203.

## <u>COUNT II</u>

### Negligence

95.     Plaintiff re-alleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

96.     Plaintiff and Class Members entrusted Defendants with their PII.

97.     Plaintiff and Class Members entrusted their PII to Defendants on the premise and with the understanding that Defendants would safeguard their information, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

98.    Defendants has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

99.    Defendants knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiff and Class Members involved an unreasonable risk of harm to Plaintiff and Class Members, even if the harm occurred through the criminal acts of a third party.

100.    Defendants had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendants' security protocols to ensure that the PII of Plaintiff and Class Members in Defendants' possession was adequately secured and protected.

101.    Defendants also had a duty to exercise appropriate clearinghouse practices to remove PII they were no longer required to retain pursuant to regulations.

102.    Defendants also had a duty to have procedures in place to detect and prevent the improper access and misuse of the PII of Plaintiff and Class Members.

103.    Defendants' duty to use reasonable security measures arose as a result of the special relationship that existed between Defendants and Plaintiff and Class Members. That special relationship arose because Plaintiff and Class Members entrusted Defendants with their confidential PII, a necessary part of obtaining services from Defendants.

104.    Defendants were subject to an "independent duty," untethered to any contract between Defendants and Plaintiff or Class Members.

105.    A breach of security, unauthorized access, and resulting injury to Plaintiff and Class Members was reasonably foreseeable, particularly in light of Defendants' inadequate security practices.

Case No.

00198937

106.   Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing the PII of Plaintiff and Class Members, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendants' systems.

107.   Defendants' own conduct created a foreseeable risk of harm to Plaintiff and Class Members. Defendants' misconduct included, but was not limited to, their failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendants' misconduct also included their decisions not to comply with industry standards for the safekeeping of the PII of Plaintiff and Class Members, including basic encryption techniques freely available to Defendants.

108.   Plaintiff and Class Members had no ability to protect their PII that was in, and possibly remains in, Defendants' possession.

109.   Defendants was in a position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

110.   Defendants had and continues to have a duty to adequately disclose that the PII of Plaintiff and Class Members within Defendants' possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

111.   Defendants had a duty to employ proper procedures to prevent the unauthorized dissemination of the PII of Plaintiff and Class Members.

112.   Defendants has admitted that the PII of Plaintiff and Class Members was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

113.   Defendants, through its actions and/or omissions, unlawfully breached its duties to Plaintiff and Class Members by failing to implement industry protocols

00198937

Case No.

and exercise reasonable care in protecting and safeguarding the PII of Plaintiffs and Class Members during the time the PII was within Defendants' possession or control.

114.    Defendants improperly and inadequately safeguarded the PII of Plaintiff and Class Members in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

115.    Defendants failed to heed industry warnings and alerts to provide adequate safeguards to protect the PII of Plaintiff and Class Members in the face of increased risk of theft.

116.    Defendants, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of PII.

117.    Defendants breached its duty to exercise appropriate clearinghouse practices by failing to remove PII it was no longer required to retain pursuant to regulations.

118.    Defendants, through its actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiff and Class Members the existence and scope of the Data Breach.

119.    But for Defendants' wrongful and negligent breach of duties owed to Plaintiff and Class Members, the PII of Plaintiff and Class Members would not have been compromised.

120.    There is a close causal connection between Defendants' failure to implement security measures to protect the PII of Plaintiff and Class Members and the harm, or risk of imminent harm, suffered. The PII of Plaintiff and Class Members was lost and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

121.    Additionally, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair

00198937

act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

122.   Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and Class Members.

123.   Defendants' violation of Section 5 of the FTC Act constitutes negligence *per se*.

124.   Plaintiff and Class Members are within the class of persons that the FTC Act was intended to protect.

125.   The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and Class Members.

126.   As a direct and proximate result of Defendants' negligence and negligence *per se*, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the present and continuing consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit

reports; (vii) the continued risk to their PII, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the PII of Plaintiff and Class Members; and (viii) present and continuing costs in terms of time, effort, and money that has been and will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

127. As a direct and proximate result of Defendants' negligence and negligence *per se*, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

128. Additionally, as a direct and proximate result of Defendants' negligence and negligence *per se*, Plaintiff and Class Members have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

129. As a direct and proximate result of Defendants' negligence and negligence *per se*, Plaintiff and Class Members are entitled to recover actual, consequential, and nominal damages.

## COUNT III

### Breach of Implied Contract

130. Plaintiff re-alleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

131. Plaintiffs and Class Members entrusted their PII to Defendants. In so doing, Plaintiff and Class Members entered into implied contracts with Defendants by which Defendants agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and Class Members if their data had been breached and compromised or stolen.

132.    In its Privacy Policy, Defendants represented that it implemented security measures to protect is customers' PII.

133.    Plaintiff and the Classes fully performed their obligations under the implied contracts with Defendants.

134.    Defendants breached the implied contracts they made with Plaintiff and Class Members by failing to safeguard and protect their personal information.

135.    As a direct and proximate result of Defendants' above-described breach of implied contract, Plaintiff and Class Members have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

136.    As a direct and proximate result of Defendants' above-described breach of implied contract, Plaintiff and Class Members are entitled to recover actual, consequential, and nominal damages.

## COUNT IV

### Unjust Enrichment

137.    Plaintiff re-alleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

138.    Plaintiffs and Class Members conferred a monetary benefit on Defendants by entering into a contract to purchase wireless telephone services from Defendants, thereby providing Defendants with their valuable PII.

139.    Defendants enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class members' PII.

140.   Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to avoid its data security obligations at the expense of Plaintiff and Class members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

141.   Under the principles of equity and good conscience, Defendants should not be permitted to retain the monetary value of the benefit belonging to Plaintiff and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

142.   Defendants acquired the monetary benefit and PII through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

143.   If Plaintiff and Class Members knew that Defendants had not secured their PII, they would not have agreed to provide their PII to Defendants.

144.   Plaintiff and Class Members have no adequate remedy at law.

145.   As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect PII in their continued possession and (vii) future

00198937

Case No.

costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

146.   As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

147.   Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class members, proceeds that they unjustly received from them.

## <u>JURY DEMAND</u>

Plaintiff demands trial by jury of all claims in this Complaint so triable.

## <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiff, on behalf of himself and all members of the Class respectfully request that (i) this action be certified as a class action, (ii) Plaintiff be designated representative of the Class, (iii) Plaintiff's counsel be appointed as counsel for the Class. Plaintiff, on behalf of himself and members of the Class further request that upon final trial or hearing, judgment be awarded against Defendants for:

(i)     actual and punitive damages to be determined by the trier of fact;

(ii)    equitable relief, including restitution;

(iii)   pre- and post-judgment interest at the highest legal rates applicable;

(iv)    appropriate injunctive relief;

(v)     attorneys' fees and litigation expenses under Code of Civil Procedure § 1021.5 and other applicable law;

(vi)    costs of suit; and

(vii)   such other and further relief the Court deems just and proper.

Respectfully submitted,

Dated: February 1, 2023

By:  *s/ William M. Audet*
WILLIAM M. AUDET

AUDET & PARTNERS, LLP
WILLIAM M. AUDET (117456)
LING Y. KUANG (296873)
KURT D. KESSLER (327334)
711 Van Ness Ave., Suite 500
San Francisco, CA 94102
Tel: 415/568-2555
415/568-2556 (fax)
waudet@audetlaw.com
lkuang@audetlaw.com
kkessler@audetlaw.com

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (SBN 149343)
PAULA R. BROWN (SBN 254142)
JENNIFER L. MACPHERSON (SBN 202021)
501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
pbrown@bholaw.com
jmacpherson@bholaw.com

*Attorneys for Plaintiff*

Case No.
CLASS ACTION COMPLAINT
00198937